IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

v.                                                                 Cr. No. 24-CR-1026-KWR

DAMIAN AMARILLO,

      Defendant.

## **DEFENDANT'S OPPOSED MOTION TO REVOKE MAGISTRATE JUDGE'S DETENTION ORDER**

Defendant Damian Amarillo, by and through his counsel of record, Assistant Federal Public Defender Emily P. Carey, and pursuant to 18 U.S.C. §§ 3142 and 3145(b), hereby asks this Court to revoke the Magistrate Judge's Order of Detention Pending Trial (Doc. 15), and respectfully requests the Court release him to the third-party custody of the La Pasada Halfway House under the supervision of the U.S. Probation and Pretrial Services Office. The rules and regulations of the halfway house, in conjunction with the conditions proposed herein, will adequately assure his appearance at future court hearings and the safety of the community. The government opposes this request. As grounds, Mr. Amarillo states the following:

## **BACKGROUND**

On August 12, 2024, Mr. Amarillo pleaded not guilty to one count of second-degree murder, aiding and abetting in violation of 18 U.S.C. §§ 2, 1153 and 1111, and one count of using and carrying a firearm during and in relation to a crime of violence and discharging said firearm in violation of 18 U.S.C. § 924(c)(1)(A)(iii). The government requested that Mr. Amarillo remain detained both as a flight risk and a danger to the community. Mr. Amarillo requested that the Court

1

release him to the third-party custody of the La Pasada Halfway House, or, alternatively, to Hoffman Hall, with any additional conditions the Court deemed appropriate including an assessment to determine whether there is a need for substance abuse treatment, drug and alcohol monitoring, and location monitoring under the curfew or home detention component. After hearing argument, the Court determined that Mr. Amarillo was not a flight risk. (Doc. 15). However, it entered an Order of Detention, finding by clear and convincing evidence that no condition or combination of conditions would reasonably assure the safety of any other person, and the community based on the nature of the alleged offense, the weight of the evidence, and concern over allegations pertaining to Mr. Amarillo's conduct while detained in Jicarilla (Doc. 15).

The magistrate court acted erroneously in denying Mr. Amarillo's release, as there are conditions that would reasonably assure his appearance in court and the safety of any other person and the community. Mr. Amarillo now respectfully asks this Court to review and revoke the Order of Detention. (Doc. 15). He respectfully requests that this Court release him to the third-party custody of the La Pasada Halfway House under the supervision of the U.S. Pretrial Services Office. Release would also facilitate Mr. Amarillo's ability to aid in his own defense and communicate with his counsel. Mr. Amarillo is willing to submit to location monitoring and/or any other conditions deemed appropriate by the Court that comply with the Bail Reform Act.

<b><u>STANDARD OF REVIEW</u></b>

Section 3145(b) of Title 18 provides that a "court having original jurisdiction over the offense" may review a magistrate judge's detention order. "When the district court acts on a motion to revoke or amend a magistrate pretrial detention order, the district court acts *de novo* and must make an independent determination of the proper pretrial detention or conditions for release." *United States v. Rueben,* 974 F.2d 580, 586 (5th Cir. 1992).

2

## LEGAL BACKGROUND

"In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 755 (1987). Congress imposed procedural safeguards designed to limit detention to only those instances where it is clearly necessary. *United States v. Holloway*, 781 F.2d 124, 125-126 (8th Cir. 1986); S. Rep. No. 225, 98th Cong. 1st Sess. 8 (1983), reprinted in 1984 U.S.C.C.A.N. 3182, 3191 (recognizing a detention statute may be constitutionally defective if it "fails to provide adequate procedural safeguards or if it does not limit pretrial detention to cases in which it is necessary to serve the societal interests it is designed to protect").

The statutory scheme of the Bail Reform Act favors pretrial release over detention. *United States v. Sabhnani*, 493 F.3d 63, 75 (2d Cir. 2007); *United States v. Orta*, 760 F.2d 887, 890 (8th Cir. 1985) (en banc). Any doubts regarding release should be resolved in the defendant's favor, *United States v. Townsend*, 897 F.2d 989, 994 (9th Cir. 1990), and only in "rare" cases should a court deny pretrial release. *Id.*, *see also United States v. Torres*, 929 F.2d 291, 292 (7th Cir. 1991) ("Pretrial detention is an exceptional step."); *Sabhnani*, 493 F.3d at 75 (pretrial detention is appropriate for only a limited group of offenders); *Orta*, 760 F.2d at 891 (Congress intended that "very few" defendants would be subject to pretrial detention); *United States v. Singleton,* 182 F.3d 7, 9 (D.C. Cir. 1999) ("Detention until trial is relatively difficult to impose.").

Section 3142 of Title 18 provides that a judicial officer must consider various release options before ordering detention. *See* 18 U.S.C. § 3142(a), (b), & (c). A defendant may be detained only if "the judicial officer finds that no condition or combination of conditions will reasonably assure the appearance of the person as required [or] the safety of any other person and the community[.]" 18 U.S.C. § 3142(e). The Act requires reasonable assurance, not a guarantee.

*United States v. Xulam,* 84 F.3d 441, 444 (D.C. Cir. 1996). In considering a motion for detention and appropriate conditions of release, a court must consider the factors under 18 U.S.C. § 3142(g). Any conditions imposed must be the least restrictive to reasonably assure the person's appearance and community safety. 18 U.S.C. § 3142(c)(B).

While certain charges trigger a presumption of detention under § 3142(e), as here, the Tenth Circuit has stated that the defendant's burden of production "is not heavy." *United States v. Stricklin,* 932 F.3d 1353, 1355 (10th Cir. 1991). The defendant need only provide "some evidence" to overcome the presumption. *Id.* The burden of persuasion regarding risk of flight and dangerousness always remains with the United States. *Id.* at 1354-55. The government must meet its burden with respect to flight risk by a preponderance of the evidence, and with respect to danger by *clear and convincing* evidence. 18 U.S.C. § 3142(f)(emphasis added); *United States v. Charley*, 2010 WL 4338094, * 4 (D.N.M. Sept. 9, 2010) (unpublished). Clear and convincing evidence is evidence that "place[s] in the ultimate factfinder an abiding conviction that the truth of its factual contentions are highly probable." *United States v. Valenzuela-Puentes*, 479 F.3d 1220, 1228 (10th Cir. 2007) (internal quotation marks omitted) (quoting *Colorado v. New Mexico*, 467 U.S. 310, 316 (1984)).

**<u>ARGUMENT</u>**

Based on the information and evidence produced herein and at the August 12, 2024, detention hearing, Mr. Amarillo easily meets his burden of presenting "some evidence" to rebut the presumption of detention. However, the United States cannot meet *its* burden. Mr. Amarillo submits that, after careful consideration of the 18 U.S.C. § 3142(g) factors, release to the third-party custody of the La Pasada Halfway House with appropriate conditions set by the Court, including participation in the location monitoring program, will comply with requirements of the

Bail Reform Act and reasonably assure his appearance at hearings as required and the safety of the community.

**A. The government cannot meet its burden to prove by a preponderance of the evidence that release of Mr. Amarillo to the third-party custody of the La Pasada Halfway House will not reasonably assure his appearance at court proceedings.**

Only a "serious" risk of flight warrants detention. *See* 18 U.S.C. § 3142(f)(2)(A); *see also United States v. Nwokoro,* 651 F.3d 108, 110 (D.C. Cir. 2011) (stressing the risk of flight must be serious). Numerous cases have addressed what is sufficient to establish by a preponderance of the evidence that a case involves a "serious" risk of flight. "In cases where only a serious risk of flight is at issue under § 3142(f)(2), it is generally accepted that more than evidence of the commission of a serious crime and the fact of a potentially long sentence is required to support a finding of serious risk of flight." *United States v. Giordano,* 370 F. Supp. 2d 1256, 1264 (S.D. Fla. 2005) (cited by *United States v. Friedman,* 837 F.2d 48, 49 (2d Cir. 1988)). Strong community ties favor release. *See Townsend,* 897 F.2d at 995.

Here, as the magistrate court correctly found, there is insufficient evidence that Mr. Amarillo poses a serious flight risk. He has strong community ties. He was born and raised in New Mexico. Not only has he never resided outside the state, but he has never resided outside of the small community of Dulce on the Jicarilla Apache Nation. (*See* Pretrial Services Report, Doc. 11 at 1). Although Mr. Amarillo's parents are no longer together, both parents still live in Dulce. (*See id.*). Mr. Amarillo maintains a close relationship with his father. He has also formed a close relationship with his mother's long time partner Alan Pinto. Prior to his arrest on this offense, Mr. Amarillo was living with his mother, his younger brother, and Mr. Pinto. (*See id.*). Mr. Amarillo's older brother lives close by and would often visit at the family home. Contrary to the United States' assertions at the detention hearing, Mr. Amarillo's relationship to his mother is not strained.

Disagreement and occasional contention between parents and their adolescent children are not uncommon.[1] And certainly, Mr. Amarillo and his mother have had disagreements, but theirs is a strong bond.

In a letter to the Court, Mr. Amarillo's mother Talicia writes of her son, "He is such an amazing young man and such a joy to be around. He is very respectful, has great manners & etiquette. He's funny, loving, playful, considerate, compassionate, affectionate, charming, friendly, and kind-hearted." (*See* Exhibit A, Letters of Support). Talicia goes on to describe a time when she fell into a deep depression in the wake of her mother's death. She reports that she could not get out of bed, let alone take care of her children. Mr. Amarillo took control during this time, taking care of the house, making sure his younger brother was eating, going to school, and staying out of trouble. He also cared for his mother by constantly checking in with her, bringing her food, and providing what emotional support he could. (*See* Exhibit A, Letters of Support). He did this even while experiencing his own grief at the loss of his grandmother.

Mr. Amarillo's family continues to support him even through these court proceedings. By way of example, Mr. Amarillo's mother, stepfather, and aunt drove all the way down from Dulce to the courthouse in Albuquerque - an approximately three-hour drive - to attend his detention hearing. At the last minute the Court had to reset the hearing because of a transport issue with the jail. And so, just a couple of days later, Mr. Amarillo's mother and stepfather once again took time off from work and made the long trip to be present at court for him. They have also maintained communication with him by phone since his incarceration at the Cibola County Correctional Center.

---

[1] *See, e.g.,* Carl E. Pickhardt, Ph.D., Why Adolescents Tend to Argue More with Parents, Psychology Today, Nov. 20, 2023, available at: https://www.psychologytoday.com/us/blog/surviving-your-childs-adolescence/202311/why-adolescents-tend-to-argue-more-with-parents (last viewed on Oct. 9, 2024).

In addition to strong community ties and familial relationships, Mr. Amarillo also has a good educational background. He graduated from Dulce High School in May 2023. (*See* Exhibit B, Diploma). During his high school years, he played football. He also participated in programs offered in the community and in school. For example, he earned a certificate after completing a personal finance program and received a certificate for completing a training in a form of martial arts focused on de-escalation called Krav Maga. (*See* Exhibit C, Certificates).



The pretrial services report cited lack of verifiable employment as a risk factor for nonappearance. However, because Mr. Amarillo is only 19 years old, he understandably lacks a long employment history. However, he reports – and his mother confirms - that during the summers while in school he worked with the Jicarilla Apache Youth Employment Program. This is a tribal sponsored paid youth program that places the community's young people in various jobs which are focused on improving and serving the community. Mr. Amarillo was not working at the time of his arrest because his mother had allowed him to have a gap year following high school to give him time to really reflect on what it is he wanted to do for a career. During this time, Mr. Amarillo researched and applied for colleges. He intended to start taking classes at San Juan Community College in the fall. (*See* Exhibit D, Letter from San Juan College). He was arrested on this offense before he could start taking classes. Were the Court to release Mr. Amarillo to the La Pasada Halfway house, he would like to pursue employment if allowed to do so.

Critically, Mr. Amarillo has no criminal history at all, no prior arrests or law enforcement contacts, and no major disciplinary issues while in school, suggesting that he is not a person who is a danger to the community or a flight risk. (*See* Doc. 11[2]). In *United States v. Raymond,* 101 F. App'x 331, 333 (10th Cir. 2004), the Tenth Circuit concluded that, even despite the defendant's criminal history and prior probation violations, the defendant's lack of failures to appear, and the fact that none of his prior probation violations involved situations indicating he is a flight risk, supported pretrial release.

In short, as the U.S. Magistrate Judge recognized, Mr. Amarillo does not pose a risk of flight, let alone a substantial one. There are conditions that can reasonably assure his appearance as required and assuage any lingering concerns that the Court may have. Such conditions could include releasing Mr. Amarillo to the third-party custody of the La Pasada Halfway House, requiring increased reporting to his probation officer, and imposing travel restrictions. The Bail Reform Act mandates that any conditions imposed must be the least restrictive to reasonably assure the person's appearance and community safety. 18 U.S.C. § 3142(c)(B). Mr. Amarillo believes that release to the third-party custody of the La Pasada Halfway House under the standard conditions of pretrial release is more than sufficient to reasonably assure his appearance. However, if the Court believes that more restrictive conditions are necessary, Mr. Amarillo is willing to participate in a location monitoring program under the curfew component, or, if deemed appropriate, under the home detention component.

---

[2] The Pretrial Services Report notes that a search of the NCIC, state, and local records revealed no criminal history for Mr. Amarillo. It notes that records from tribal court "reflect the defendant is the subject in two matters" and then lists the case numbers – one from 2004 and one from 2005. Given that Mr. Amarillo was born in 2005, it is highly unlikely that these records pertain to him.

**B. The United States cannot meet its burden to prove by clear and convincing evidence that release of Mr. Amarillo to the third-party custody of the La Pasada Halfway House, will not reasonably assure community safety.**

Mr. Amarillo also does not pose a danger to any specific person or the community. The Bail Reform Act "authorizes the detention prior to trial of arrestees charged with serious felonies who are found after an adversary hearing to pose a threat to the safety of individuals or to the community which no conditions of release can dispel." *Salerno,* 481 U.S. at 755. To justify the preventative detention portion of the Bail Reform Act, Congress reasoned:

> [T]here is a small but identifiable group of particularly dangerous defendants as to whom neither the imposition of stringent release conditions nor the prospect of revocation of release can reasonably assure the safety of the community or other persons. It is with respect to this *limited* group of offenders that the courts must be given the power to deny release pending trial.

S. Rep. No. 225, 98th Cong. 1st Sess. 6-7 (1983), reprinted in 1984 U.S.C.C.A.N. 3182, 3189 (emphasis added). Mr. Amarillo does not fit into that "limited group of offenders," and there are conditions – such as those outlined above - that can be fashioned which would relieve any concerns the Court might have.

The United States argued at the detention hearing that the facts of this case and the weight of the evidence support Mr. Amarillo's continued detention. The U.S. Magistrate Judge primarily denied Mr. Amarillo's request for release based on the nature and circumstances of the offenses charged and weight of the evidence. Undersigned counsel is still reviewing discovery herself and with Mr. Amarillo and does not wish to litigate over the facts or reveal defense strategy at this stage. However, the facts of the case appear less straightforward than the government portended at the detention hearing. Law enforcement officials arrested two other individuals at the same time as Mr. Amarillo, one of whom admitted during a post-arrest interview, that he had been walking around Dulce on the night of the alleged offense carrying an AR-style semi-automatic rifle. Upon

9

information and belief, the United States may be considering bringing federal charges against that individual.

Regardless, the "weight of the evidence" factor "goes to the weight of the evidence of dangerousness [or risk of flight], not the weight of the evidence of the defendant's guilt." *United States v. Stone,* 608 F.3d 939, 948 (6th Cir. 2010); *see also United States v. Hunt,* 240 F. Supp. 128, 134 (D.D.C. 2017). Of the various 3142(g) factors, courts have deemed the weight of the evidence to be the least important factor. *See, e.g, Townsend,* 767 F.2d at 1408; *United States v. Motamedi*, 767 F.2d 1403, 1408 (9th Cir. 1985) (noting the weight of the evidence "is the least important of the various factors"); *United States v. Carrasco-Carrasco,* 2020 WL 7626537 (D. Kansas Dec. 22, 2020) (noting that the weight of the evidence factor "has been deemed the least important of the various [3142(g)] factors because, if the court impermissibly makes a preliminary determination of guilt, the refusal to grant release could become in substance a matter of punishment") (internal quotation marks and citation omitted).

An important and fundamental premise of the American judicial system is the presumption of innocence until proven guilty. In *Motamedi* the court explained:

> Although the statute permits the court to consider the nature of the offense and the evidence of guilt, the statute neither requires nor permits a pretrial determination that the person is guilty. These factors may be considered only in terms of the likelihood that the person will fail to appear or will pose a danger to any person or to the community. Otherwise, if the court impermissibly makes a preliminary determination of guilt, the refusal to grant release could become in substance a matter of punishment.

767 F.2d at 1408. (citations omitted). Although Mr. Amarillo acknowledges that the charges against him are very serious, and that he is facing a substantial sentence if convicted, he is presumed innocent. *See Stack v. Boyle,* 342 U.S. 1, 4 (1951) ("Unless the right to bail before trial

is preserved, the presumption of innocence, secured only after centuries of struggle, would lose its meaning."); 18 U.S.C. § 3142(j).

Mr. Amarillo's family and community ties belie any suggestion that he will be a danger to the community. *See, e.g., Charley,* 2010 WL 4338094 at \*6-7 (despite "relatively substantial" weight of the evidence, considering the defendant's employment history and family ties as factors suggesting the defendant would not endanger the community if released under appropriate conditions); *United States v. Robertson,* 2008 WL 2565015, at \*2 (D.N.D. June 24, 2008) (considering lifelong residence in the community, history of construction employment, and mother's support as factors suggesting the defendant would not endanger the community if released under appropriate conditions). As detailed above, all of Mr. Amarillo's immediate family members, and the vast majority of his extended family members, all live in New Mexico. He has deep roots in Dulce and as a member of the Jicarilla Apache tribe and has never lived anywhere else. As a child, his father taught him Apache traditions. (*See* Exhibit A, Letters of Support). He learned some traditional drumming. Mr. Amarillo has also participated in the harvest relay of the tribe's annual Go-Jii-Ja celebration. Because of his incarceration on this offense, this year's celebration was the first he has missed since he was little. Additionally, although he is too young to have a long employment history, Mr. Amarillo attended and graduated from Dulce High School, worked for the tribal youth program during the summers, and planned to attend San Juan College this semester.

The allegations against Mr. Amarillo are understandably concerning, but it bears noting again that Mr. Amarillo has no prior criminal history at all. He reports that he also has never had any serious infractions while at school. There is no evidence of past violent conduct or character. Mr. Amarillo's former science teacher, Marco Antonio Badilla, writes that Mr. Amarillo was

always respectful to those around him, and, to his knowledge, never got into any real trouble at school. (*See* Exhibit A, Letters of Support). He describes Mr. Amarillo as a "jolly, friendly, and respectful student[.]" Mr. Amarillo may still be quite young, but the Court sees many young clients who, by the time they are Mr. Amarillo's age, have acquired numerous juvenile arrests, charges, juvenile delinquent adjudications, convictions, or have significant school disciplinary records for fights and other violent offenses. None of these apply to Mr. Amarillo.

Importantly, Mr. Amarillo is not asking the Court to allow him to return to his family's home in Dulce, which also happens to be the same community of the alleged victim's family. He is asking to remain in Albuquerque at a place with incredibly strict rules, which is approximately 170 miles and a three-hour drive from Dulce. He understands the Court would restrict his travel to Bernalillo County, and that the Court has at its discretion the ability to impose location monitoring to keep track of his movements. He has no interest in, or intention to, contact the alleged victim's family, but the Court can certainly prohibit him from doing so by court order. He would similarly be prohibited from having any contact with witnesses, though we would ask for an exception to allow him to speak to his immediate relatives (mother, stepfather, brothers), with the limitation that they are not to speak with one another about the facts of the case.

Mr. Amarillo is also not asking the Court to release him on his own recognizance. Rather, he is asking the Court to release him to the third-party custody of the La Pasada Halfway House. Should the Court release him to the halfway house, he would be subject to very strict conditions. A residential reentry center (RRC), such as La Pasada, is a structured, supervised environment. Staff monitor a resident's location and movement twenty-four hours a day. Residents are only allowed to leave the house with prior approval from staff. Staff also administer random drug and alcohol tests and conduct random in-house counts throughout the day. *See, e.g., United States v.*

*Ray,* 578 F.3d 184, 201 n. 16 (2d Cir. 2009) (citing Federal Bureau of Prisons, http://www.bop.gov/locations/cc/index.jsp). There are restrictions on phone privileges, visitation rights, management of living quarters and food, and limitations on the types of goods and reading materials that a resident can bring into the facility. *United States v. Mori*, 798 F. Supp. 629, 633 (D. Ha. 1992), *overruled on other grounds, Reno v. Koray,* 515 U.S. 50, 54-65 (1995).

In addition to the restrictions placed on Mr. Amarillo by the halfway house itself, Mr. Amarillo would be subject to additional conditions under the supervision of the U.S. Pretrial Services Office. For example, the pretrial services report cites substance abuse and mental health history as factors contributing to the assessment of danger. Mr. Amarillo has no prior mental health history, though he acknowledges telling Jicarilla Behavioral Health that he was feeling depressed *after* his incarceration on this alleged offense. Nor does he have a long-documented history of substance abuse. Nevertheless, to allay any concerns, the Court can require that Mr. Amarillo submit to random drug and alcohol screening and participate in a mental health assessment and a substance abuse assessment to determine whether treatment might be appropriate. If assessments reveal that treatment would be appropriate, the Court can mandate his participation. Mr. Amarillo will submit to location monitoring under the curfew or home detention components as an additional condition if the court feels it appropriate. Release to the halfway house combined with electronic or GPS monitoring would allow the Court to monitor Mr. Amarillo at all times.

In short, Mr. Amarillo is willing to submit to any additional conditions the Court feels are appropriate. Such conditions attendant to Mr. Amarillo's release would eliminate any possible risk that Mr. Amarillo would endanger anyone. *See, e.g., Raymond,* 2004 WL 1368831 at *2-3 (district court's "strict" conditions on defendant's release to the third party custody of his wife reasonably ensured defendant would not be danger); *United States v. Medina,* 2011 WL 3897709 at *5

(W.D.N.C. Sept. 6, 2011) (conditions of release, including prohibition on consumption of alcohol, and the willingness of family members to supervise defendant assured community's safety).

Finally, Mr. Amarillo's age is a factor that he asks the Court to consider in favor of release to the halfway house. He had his 19th birthday in March, less than three months prior to the offenses alleged in the indictment. He graduated from high school a little over a year ago. He has never lived independently. He has never been without family. He has never really been alone. And he certainly has never been in any environment like what he has experienced over the last few months. Mr. Amarillo reports that, while detained at the local jail in Jicarilla for two months, he was isolated much of the time. He was in a cell by himself. For the first approximately 8 days the facility placed him in a padded cell for unknown reasons. He was then for a short time in a cell by himself, but within sight of others and with access to television. He reports that jail staff then moved him again, and he remained for the rest of his time at the Jicarilla jail in what was effectively solitary confinement with little to no social interaction, radio, television or other form of sensory stimulation. He was initially allowed one phone call per week, but then all contact with his family was cut off. Recreation was supposed to be afforded to him at least one hour a day. However, Mr. Amarillo reports that he at most received one hour of recreation a week. He recalls at one point going two and a half to three weeks without any recreation at all. The isolation understandably had a negative effect on his mental health.

Mr. Amarillo has now been at the Cibola County Correctional Center for approximately two months. The potential harm to young adults in adult detention settings is well documented.[3]

---

[3] *See, e.g.,* Alex Frank, *Why Reimagining Prison for Young Adults Matters*, Vera Institute of Justice, Feb. 28, 2017, available at: https://www.vera.org/news/why-reimagining-prison-for-young-adults-matters, last viewed on Oct. 8, 2024.  *See also,* Coalition for Juvenile Justice, Policy Position 12: Keep Youth Out of Adult Courts, Jails, and Prisons, available at: https://www.juvjustice.org/about-us/core-principles/keep-youth-out-adult-courts-jails-and-prisons (last viewed on Oct. 9, 2024) (noting that youth held in adult facilities are 36 times more likely to commit suicide and are at the greatest risk of sexual victimization).

And Cibola is a particularly difficult environment for even our most seasoned clients, let alone a young man who, for all developmental purposes is still a kid who has never been in a carceral setting. Mr. Amarillo's experience of incarceration over the last few months is certainly an additional protective factor against any violation of his conditions of release should the Court grant this motion. He now knows what awaits him and does not want to risk any freedom the Court might grant him. Simply put, there is too much at stake both personally and legally for Mr. Amarillo to engage in a course of conduct that would endanger the community.

## CONCLUSION

In a recent paper created as part of Columbia University's Square One Project, the authors examined widespread pre-trial detention in the United States, noting that more than two-thirds of those held in American jails are pretrial detainees - a statistic they claim "should shock the conscience of all Americans."[4]  They suggest supporting the bedrock principle of presumption of innocence with another presumption: a presumption of liberty.[5] Indeed, the United States Supreme Court has long recognized the constitutional limits on pretrial detention. *See Salerno,* 481 U.S. at 746-48).  And Congress, through the Bail Reform Act, imposed procedural safeguards designed to limit detention to only those instances where it is clearly necessary. *United States v. Holloway,* 781 F.2d 124, 125-26 (8th Cir. 1986).  This is not one of those instances.  Mr. Amarillo has set forth sufficient evidence to overcome the presumption of detention, but the United States cannot meet its burden. There are conditions that will reasonably assure Mr. Amarillo's appearance as required and community safety, while also safeguarding Mr. Amarillo's rights.

---

[4] *See* Tracey Meares & Arthur Rizer, *The "Radical" Notion of the Presumption of Innocence,* Square One Project (July 2020), available at: https://www.safetyandjusticechallenge.org/2020/07/the-radical-notion-of-the-presumption-of-innocence-a-better-way-forward/ (last viewed on Aug. 20, 2021).
[5] *See id.* at 5.

15

WHEREFORE, for the reasons outlined herein, Mr. Amarillo respectfully requests that this Court revoke the U.S. Magistrate Judge's Order of Detention and release him to the third-party custody of the La Pasada Halfway House under the supervision of pretrial services.

Respectfully Submitted,

**FEDERAL PUBLIC DEFENDER**
111 Lomas NW, Suite 501
Albuquerque, NM 87102
(505) 346-2489

*Electronically filed October 9, 2024*
/s/ Emily P. Carey
Assistant Federal Public Defender
Attorney for Defendant

16