IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

    Plaintiff,

v.                                                                          Cr. No. 24-CR-1026-KWR

DAMIAN AMARILLO,

    Defendant.

## DEFENDANT'S REPLY TO UNITED STATES' RESPONSE TO OPPOSED MOTION TO REVOKE MAGISTRATE JUDGE'S DETENTION ORDER

Defendant Damian Amarillo, by and through his counsel of record, Assistant Federal Public Defender Emily P. Carey, and pursuant to 18 U.S.C. §§ 3142 and 3145(b), respectfully files this reply to the United States' Response to Motion to Revoke Magistrate Judge's Detention Order. (Response, Doc. 20). The United States opposes Mr. Amarillo's release contending first that he failed to rebut the presumption of detention under 18 U.S.C. § 3142(e)(3)(B). The United States further argues that most of the relevant 18 U.S.C. § 3142(g) factors favor pretrial detention. Mr. Amarillo disputes these contentions and asks this Court to release him to the third-party custody of the La Pasada Halfway House under the supervision of the U.S. Probation and Pretrial Services Office. These, and the other conditions proposed below, will reasonably assure his appearance at Court and the safety of the community as prescribed by the Bail Reform Act.

## ARGUMENT

"Unless the right to bail is preserved, the presumption of innocence, secured only after centuries of struggle, would lose its meaning." *Stack v. Boyle,* 342 U.S. 1, 4 (1951). The Tenth Circuit has affirmed that, "[i]n our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *United States v. Ailon-Ailon,* 875 F.3d 1334, 1336 (10th

1

Cir. 2017) (quoting *United States v. Salerno,* 481 U.S. 739, 755 (1987)). When structuring release of a defendant, the court must impose the least restrictive condition or combination of conditions necessary to "reasonably assure" the defendant's appearance as required and to "reasonably assure" the safety of any other person and the community." 18 U.S.C. § 3142(c). "[T]statute requires that the court consider a range of alternatives to pre-trial confinement before ordering detention and, if detention is ordered, to explain why lesser conditions are inadequate." *United States v. Gerkin*, 570 Fed. Appx. 819, 822 (10th Cir. 2014). Doubts regarding the propriety of release should be resolved in the defendant's favor. *United States v. Motamedi*, 767 F.2d 1403, 1405 (9th Cir. 1985) (citation omitted).

A.  Mr. Amarillo has rebutted the presumption of detention under 18 U.S.C. § 3142(e)(3)(B)

In the opening paragraph of its Response, the United States concludes – without any further explanation in its brief – that Mr. Amarillo has not rebutted the presumption of detention under 18 U.S.C. § 3142(e)(3)(B). The Tenth Circuit has stated that the defendant's burden of production "is not heavy." *United States v. Stricklin,* 932 F.3d 1353, 1355 (10th Cir. 1991). The defendant need only provide "some evidence" to overcome the presumption. *Id.* The burden of persuasion regarding risk of flight and dangerousness, however, always remains with the United States. *Id.* at 1354-55. To determine whether the defendant has rebutted the presumption of detention, a court must consider the factors in 18 U.S.C. § 3142(g). *United States v. Rodriguez*, 147 F. Supp. 3d 1278 (D.N.M. 2015).

Evidence courts in this district consider sufficient to overcome the presumption of pretrial detention include a defendant's lack of resources to flee, significant community ties, strong employment history, and lack of recent criminal convictions. *Rodriguez,* 147 F. Supp. 3d at 1290; *see also United States v. Charley,* 2010 WL 4338094 (D. N.M. Sept. 9, 2010) (determining the

defendant rebutted the presumption of detention as to flight risk based on steady employment, long standing ties to New Mexico, a ten-year marriage, and cooperation with authorities). Based on the information and evidence produced in his motion, this reply, and at the August 12, 2024, detention hearing, Mr. Amarillo meets his burden of presenting "some evidence" to rebut the presumption of detention. However, the United States cannot meet *its* burden.

B. <u>Mr. Amarillo does not pose a serious risk of flight</u>.

Only a "serious" risk of flight warrants detention, *see* 18 U.S.C. § 3142(f)(2)(A), and the United States has failed to present sufficient evidence to demonstrate that Mr. Amarillo poses a "serious" flight risk. The U.S. Magistrate Judge agreed. Mr. Amarillo does not dispute that the charges against him are serious and that, if convicted as charged, he faces a significant sentence. But "it is generally accepted that more than evidence of the commission of a serious crime and the fact of a potentially long sentence is required to support a finding of serious risk of flight." *United States v. Giordano,* 370 F. Supp. 2d 1256, 1264 (S.D. Fla. 2005) (cited by *United States v. Friedman,* 837 F.2d 48, 49 (2d Cir. 1988)). Strong community ties, however, favor release. *See United States v. Townsend,* 897 F.2d 989, 995 (10th Cir. 1990).

As described in his Motion, and conceded by the United States, Mr. Amarillo has strong family and community ties. (Response at 7). He has never lived independently. He has never lived outside of Dulce, New Mexico. His mother, father, stepfather, siblings, and extended family members all live in the same community. He graduated from Dulce High School and planned to attend college nearby in the fall. Dulce is not just the place of his familial home; it is the place of his tribal roots and traditions. Under these circumstances, there is virtually no risk of flight.

Mr. Amarillo does not deny that law enforcement encountered him and his girlfriend, Genesis Cassador, in a shed. This shed was on Mr. Amarillo's family property. Ms. Cassador

explained to law enforcement that she and Mr. Amarillo tried to get into his house and were knocking on the doors and windows, but no one in the home was answering. Ms. Cassador was cold, and the shed provided at least some shelter from the elements. Importantly, Mr. Amarillo did not leave Dulce, hide out in someone else's home or other remote location. Rather, he remained in the shed owned by his family and immediately next to his own home, a home he sought to enter but could not because the doors were locked. Once he emerged from the shed, he made no attempt to flee or resist officers. He was then compliant and cooperative with their instructions.

The United States points to Mr. Amarillo's alleged conduct in the Jicarilla Apache jail when first arrested as additional evidence of flight risk. (Response at 7). A correctional officer at the jail claims that Mr. Amarillo asked him to give a note to Mr. Amarillo's mother and to bring in a cell phone to allow Mr. Amarillo to text with his mother. At the time of his arrest, Mr. Amarillo was barely 19 years old. He had never had any prior experiences with law enforcement, he had never been without family, he had never been alone. During much of the two months he was detained in Jicarilla, Mr. Amarillo reports he was housed in solitary confinement with little to no social interaction, and no radio, television, phone communication or other form of sensory stimulation. Correctional staff rarely brought him out of his cell for outside recreation. He was scared. His mental health deteriorated. He was starving for interaction and missing his family. While certainly not condoning any inappropriate requests Mr. Amarillo might have made to communicate with his mother, there is also nothing in the letter the correctional officer turned over that is even moderately suggestive of flight risk. Mr. Amarillo requests that his family assist him in obtaining a lawyer, requests visits from his aunt Heather and his stepfather, requests that his little brother send him song lyrics, and acknowledges that he is "having a hard time with [his] mental health." There is no indication at all that Mr. Amarillo planned to run or do anything other

than obtain legal assistance to face his charges head on. In short, there is simply no evidence at all that Mr. Amarillo poses a flight risk, let alone a "serious" flight risk.

    C.  <u>Mr. Amarillo does not pose a danger to the safety of any other person or the community</u>.

The United States has also failed to demonstrate by clear and convincing evidence that Mr. Amarillo poses a danger to the safety of any other person or the community. The United States bases its entire argument for detention on the nature and circumstances of the offense and the weight of the evidence. Without a doubt, the charges filed against Mr. Amarillo are incredibly serious. But the facts about what transpired in the hours preceding John Doe's death are not nearly as absolute as the United States portends them to be.

The United States places a great deal of onus on statements that Mr. Amarillo's friend, Damian Ayzie, provided to law enforcement. What the United States failed to inform the Court is that Mr. Ayzie is himself implicated in John Doe's death. He is facing tribal charges. Upon information and belief, Mr. Ayzie is currently the target of a federal investigation into John Doe's death. Mr. Ayzie was with Mr. Amarillo on the night John Doe was killed and has every reason to try to protect himself by distancing himself from the killing. As such, the Court should be cautious when relying on Mr. Ayzie's words to establish weight of the evidence. The only firearm other witnesses observed that night was an AR-style semi-automatic rifle that Mr. Ayzie possessed, and which was later seized from his home pursuant to a search warrant.[1] Not one witness – apart from Mr. Ayzie – claims seeing Mr. Amarillo with a firearm that night. The United States writes that Jicarilla police were investigating an allegation that Mr. Amarillo had pulled a gun on another individual two weeks prior. (Response at 10). However, the United States left out that the matter

---

[1] The defense acknowledges that law enforcement recovered 9 mm casings from the scene of the shooting. The rifle Ayzie possessed, a Smith & Wesson M&P 15, was chambered for .223 and not chambered for 9 mm cartridges.

was investigated, and John Lucero, the individual "a couple of young kids" were alleged to have threatened with a firearm, advised law enforcement that this never happened.

Unlike Mr. Amarillo, Mr. Ayzie has some juvenile criminal history, though admittedly the circumstances of those matters are unknown. The young person law enforcement interviewed, referenced on page 5 of the United States' Response, advised that he saw Mr. Ayzie with the rifle on the night of the shooting. He did not see Mr. Amarillo with a gun. He told officers that at some point, both Mr. Amarillo and Mr. Ayzie walked over to Mr. Ayzie's house up the road. When the two emerged, Mr. Ayzie had changed his clothes such that he was wearing all black and a face mask. The juvenile witness heard the two Damians fighting and then heard the rifle "rack," suggesting Mr. Ayzie may have threatened Mr. Amarillo with the rifle. Additionally, a .223 caliber cartridge, the same caliber carried by Mr. Ayzie's rifle, was recovered somewhat near the scene of the shooting. The evidence implicates greater involvement on Mr. Ayzie's part than what the United States proposes.

The United States concedes that there are statements suggesting that John Doe may have had a knife. Dominic Amarillo told law enforcement that John Doe walks around town with a "machete," and that he had seen John Doe with the "machete" the night of the shooting. The juvenile law enforcement interviewed stated that he saw John Doe pick up a backpack and take something out. Law enforcement did not ask any additional questions to ascertain what John Doe took out of his bag. Damian Ayzie told law enforcement during his initial interview that John Doe charged at Mr. Amarillo who Mr. Ayzie claims told him John Doe had a knife. The defense is still reviewing the extensive discovery in this case and conducting its own investigation. Suffice it say, however, that the facts are equivocal.

Regardless, Mr. Amarillo is presumed innocent of the charges filed against him. Accordingly, the "weight of the evidence" factor "goes to the weight of the evidence of dangerousness [or risk of flight], not the weight of the evidence of the defendant's guilt." *United States v. Stone,* 608 F.3d 939, 948 (6th Cir. 2010); *see also United States v. Hunt,* 240 F. Supp. 128, 134 (D.D.C. 2017). The evidence here weighs against detention. The United States acknowledges that Mr. Amarillo's history and personal characteristics weigh in favor of release. (Response at 10). Critically, Mr. Amarillo has no criminal history at all, no prior arrests or law enforcement contacts, no major disciplinary issues while in school, and does not appear to have a reputation in the community as someone who is violent or a troublemaker. These facts all suggest that he is not a person who is a danger to the community or a flight risk. (*See* Doc. 11). Whatever involvement he may have allegedly had in John Doe's death would reflect aberrant behavior rather than reflect a young man who poses a continuing danger to the community.

In *Rodriguez*, a case in which the defendant was charged with an offense that carried a presumption of detention, the court determined that the United States had not met its burden of proving by clear and convincing evidence that the defendant posed a danger to the community. 147 F. Supp. at 1297. The court cited the defendant's lack of criminal history and lack of history of failures to appear as indicia that he would not endanger the community. *Rodriguez,* 147 F. Supp. at 1297-98 ("With Rodriguez' lack of criminal convictions and failures to appear, the Government has no sound basis to believe Rodriguez would endanger the community"). The court also noted that the defendant's personal characteristics, including strong family and community ties, and strong employment history, also undercut the idea that the defendant posed a danger to the community. *Id*.

Recognizing the *Rodriguez* case addressed a different type of offense, Mr. Amarillo still urges the Court to reach the same conclusion here that the United States did not meet its burden of demonstrating that Mr. Amarillo poses a danger to the community. Like the defendant in *Rodriguez*, here Mr. Amarillo has no criminal history, no history of prior violence, and no failures to appear. He also has strong family and community ties, and, although he has limited work history because of his age, he graduated from high school and was supposed to begin classes at San Juan College this past fall.

The U.S. Magistrate Judge seriously considered Mr. Amarillo's request for release to the La Pasada Halfway House but took pause only when presented with information proffered by the United States that Mr. Amarillo allegedly attempted to get a letter to his mother and to obtain a cell phone while in custody at the Jicarilla Apache jail. Correctional officers also purportedly located other letters in Mr. Amarillo's cell including one believed to be meant for Mr. Ayzie. Mr. Amarillo already addressed the matter of alleged attempted communications with his mother. The other writings located in Mr. Amarillo's cell were merely that – writings that were never delivered to anyone and which may never have been intended for anyone. Mr. Amarillo was afraid, alone, and struggling with depression. All he had was paper and his own thoughts. The writing the United States references includes a reminder of the constitutional right to remain silent and to have a lawyer. The writing reads less like an effort to influence a witness, than an effort to find a way to protect a friend who appears to be much more involved in the alleged offense than what that friend is now telling law enforcement. The U.S. Magistrate Judge, and now the United States, viewed these allegations of conduct in the Jicarilla facility as indicative of Mr. Amarillo's ability, or lack thereof, to comply with conditions imposed by the Court if released. There is nothing to support this supposition.

8

Indeed, Mr. Amarillo has now been at the Cibola County Correctional Center for approximately three months. Upon information and belief, he has not had any disciplinary issues while at Cibola, suggesting he can follow rules.[2] There is no evidence that Mr. Amarillo has attempted to contact Mr. Ayzie or otherwise taking steps to influence witness statements. Mr. Amarillo's months at the Cibola facility demonstrate that he can comply with rules and restrictions. These months at Cibola have all but guaranteed that, if released, he will not do anything to jeopardize his freedom because the last place he wants to return is Cibola. Because Mr. Amarillo is young and inexperienced in jail politics, he lives in constant fear of others taking advantage of him or physically harming him. This fear is not speculative. He has witnessed brutal attacks on others in his unit. This experience of incarceration over the last few months is a protective factor against any violation of his conditions of release should the Court grant his request for release to the La Pasada Halfway House.

D. <u>Release to the La Pasada Halfway House under the supervision of pretrial services would reasonably assure Mr. Amarillo's appearance at court and community safety</u>.

The United States claims that there are no conditions that can reduce the risk of non-appearance or danger to the community (Response at 11), but it has provided no explanation for why the conditions Mr. Amarillo proposes are inadequate even were the Court to agree that Mr. Amarillo poses some modicum of risk. Contrary to the United States' conclusory assertion, there are conditions that can reasonably assure his appearance as required and assuage any lingering concerns that the Court may have.

The Bail Reform Act mandates that any conditions imposed must be the least restrictive to reasonably assure the person's appearance and community safety. 18 U.S.C. § 3142(c)(B). As

---

[2]Nor did Mr. Amarillo have any serious disciplinary issues while in school, which also suggests ability and willingness to comply with rules.

described more fully in his initial Motion, Mr. Amarillo proposes release to the third-party custody of the La Pasada Halfway House under the standard conditions of pretrial release. La Pasada is located more than 170 miles and a three-hour drive from Dulce, New Mexico where John Doe's family and nearly all witnesses reside. La Pasada already imposes its own restrictions on movement into and out of the house, but the Court can also restrict Mr. Amarillo's travel to Bernalillo County. Mr. Amarillo is willing to participate in a location monitoring program if the Court wishes to have additional safeguards to track Mr. Amarillo's whereabouts. Release to the halfway house combined with electronic or GPS monitoring would allow the Court to always monitor Mr. Amarillo.

Mr. Amarillo does not intend to contact the alleged victim's family, but the Court can certainly prohibit him from doing so by court order. The Court can similarly prohibit him from having any contact with witnesses, though we would ask for an exception to allow him to speak to his immediate relatives (mother, stepfather, brothers), with the limitation that they are not to speak with one another about the facts of the case. Although perhaps overly restrictive at this stage, the Court has at its discretion the ability to order that Mr. Amarillo install a computer monitoring program on his telephone to track communications in the unlikely event concerns arise in the future. The pretrial services office also retains the authority to search Mr. Amarillo's phone if there is reasonable suspicion to believe that evidence of a violation of his conditions can be located there. Additionally, the Court can require that Mr. Amarillo submit to random drug and alcohol screening and participate in a mental health assessment and a substance abuse assessment to determine whether treatment might be appropriate. If assessments reveal that treatment would be appropriate, the Court can mandate his participation. These conditions would reasonably assure

10

his appearance as required and the safety of the community. However, Mr. Amarillo is also willing to consider any additional conditions the Court may deem appropriate.

## **CONCLUSION**

The Bail Reform Act's preference for liberty – a preference that is consistent with and demanded by our entire heritage – ensures that pretrial detention will occur only in unusual circumstances. *Hamilton v. Lyons,* 74 F.3d 99, 105 (5th Cir. 1996). This is not one of those unusual circumstances in which pretrial detention is necessary. Mr. Amarillo does not pose a substantial flight risk, nor does he pose a danger to the community. Nevertheless, were the Court to disagree and determine that Mr. Amarillo posed some level of risk of flight or danger, the conditions Mr. Amarillo poses here and in his initial Motion are more than sufficient to reasonably assure his appearance at Court and the safety of the community.

WHEREFORE, for the reasons outlined herein and in his initial Motion, Mr. Amarillo respectfully requests that this Court revoke the U.S. Magistrate Judge's Order of Detention and release him to the third-party custody of the La Pasada Halfway House under the supervision of pretrial services.

Respectfully Submitted,

**FEDERAL PUBLIC DEFENDER**
111 Lomas NW, Suite 501
Albuquerque, NM 87102
(505) 346-2489

***Electronically filed November 11, 2024***
/s/ Emily P. Carey
Assistant Federal Public Defender
Attorney for Defendant